**SO ORDERED.**

**SIGNED this 13 day of May, 2011.**



_____
**JANICE MILLER KARLIN**
**UNITED STATES BANKRUPTCY JUDGE**

_____

OPINION DESIGNATED FOR PRINT PUBLICATION

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF KANSAS

| | | |
|---|---|---|
| In re: | ) | |
| **MOHAMMAD ASIF and UZMA SHAHZADI,** | ) | Case No. 09-41026 |
| | ) | Chapter 7 |
| Debtors. | ) | |
| _____ | ) | |
| **HILDA L. SOLIS, Secretary of Labor** | ) | |
| **United States Department of Labor,** | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Adv. No. 09-7061 |
| | ) | |
| **MOHAMMAD ASIF,** | ) | |
| | ) | |
| Defendant. | ) | |
| _____ | ) | |
| **DARCY D. WILLIAMSON, Trustee for the** | ) | |
| **bankruptcy estate of Mohammad Asif and** | ) | |
| **Uzma Shahzadi,** | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Adv. No. 10-7007 |
| | ) | |
| **MOHAMMAD ASIF and UZMA SHAHZADI,** | ) | |
| | ) | |

## MEMORANDUM OPINION AND ORDER

This matter is before the Court on the Complaint by Hilda L. Solis, Secretary of Labor, ("DOL") objecting to the discharge of the debt owed by Debtor and Defendant, Mohammad Asif ("Asif"), pursuant to 11 U.S.C. § 523(a)(2)(A),[1] and the Complaint by Darcy Williamson, Chapter 7 Trustee ("Trustee"), objecting to Asif obtaining a discharge pursuant to §§ 727(a)(3), (4)(A), (4)(D), and (5).[2]  Trustee also seeks turnover of estate property pursuant to § 542 and a money judgment of $48,000 plus costs and post-judgment interest.[3]

The Court conducted a consolidated trial on these two adversary proceedings, has reviewed the parties' post trial briefs with proposed findings of fact and conclusions of law, which the parties requested to file, and is ready to rule.  These matters constitute core proceedings over which the Court has jurisdiction and authority to enter a final order.[4]

## I.    FINDINGS OF FACT

The Court makes the following findings of fact based upon the numerous stipulations of the parties contained in the Pretrial Order entered in each adversary and the evidence presented at trial. Debtors were the owners/operators of several convenience stores/gas stations in the Topeka, Kansas

---

[1] All future statutory references are to the Bankruptcy Code, as amended by the Bankruptcy Abuse Prevention and Consumer Protection Act of 2005, 11 U.S.C. §§ 101 - 1532 (2005), unless otherwise specifically noted.

[2] Although the Trustee's Adversary Proceeding was originally brought against both Debtors, the Trustee voluntarily dismissed the action against Defendant Uzma Shahzadi at the commencement of the trial.

[3] The Trustee actually seeks a money judgment of $48,000 "plus any additional amount not accounted for by Debtors."  *See* Adv. No. 10-7007, Pretrial Order, Doc. 44, p. 11.

[4] See 28 U.S.C. § 157(b)(2)(I) and (J) (core proceedings) and § 157(b)(1) (authority to hear core proceedings). The parties stipulated to venue and jurisdiction in each of the two Pretrial Orders, Adv. No. 09-7061, Doc. 74 and Adv. No. 10-7007, Doc. 44, respectively, in the DOL and § 727 Complaints.

2

area, including the 29th Street Quick Stop (located on 29th Street), A & U LLC (located on 6th Avenue), the Topeka Quick Stop LLC (located on Topeka Blvd), and two other convenience stores at 2701 SE California and 29th and Randolph.[5] Debtors also owned and managed two parent companies for the above convenience stores—Maham, Inc. and Mahaom LLC.

These companies owned the real estate at both the 6th Avenue and California Street locations. Although the ownership percentages varied, each of the above businesses was solely owned by Debtors. The evidence at trial showed that only Asif actively participated in operating these businesses, and that Uzma Shahzadi had very little, if any, role in the daily operations of the convenience stores or the parent companies, or in making any decisions about their operation. The evidence also established that while Asif had help from his accountant, Ajay Dave, on many aspects of the businesses, including seeking nonimmigrant workers, Asif was fully aware of and authorized all of Dave's actions conducted in connection with these businesses.

## A. Facts relating to the first H-1B application

In 2005, Asif and Mahaom LLC participated in the federal government's H-1B[6] visa program in an attempt to bring two Pakistani specialty workers to the United States.[7] The H-1B visa program is designed to allow employers to bring nonimmigrant workers into the United States on a temporary

---

[5]*See* Case No. 09-41026, Doc. 1, Statement of Financial Affairs Question 18 at p. 43.

[6]This program's nomenclature, the H-1B program, arises from its placement in Title 8, United States Code, at 8 U.S.C. § 1101(a)(15)*(H)(i)(b)* (emphasis added). 8 U.S.C. § 1184, to which § 1101 provides definitions, deals with the admission of nonimmigrants into the United States.

[7]Asif initially testified at his § 341 meeting that he only participated once in this program, but after discovery was complete, DOL discovered this was untrue, as discussed further, below. Asif then quibbled about who he had told what information concerning the second application. The Court finds his testimony lacking in credibility on this issue.

3

basis to fill jobs requiring specialized knowledge and training.[8]  In order to receive these nonimmigrant visas, an employer must file a Labor Condition Application for Nonimmigrant Workers ("LCA")[9] with the United States Department of Labor under procedures set forth by 8 U.S.C. § 1182(n).  The employer then must file an I-129 Petition for Nonimmigrant Worker with the United States Customs and Immigration Service ("USCIS").

One of the guarantees an employer must make in filing these applications is that it will pay the foreign worker at least the local prevailing wage for the job for which the worker will be hired. This is so H-1B workers do not displace U.S. workers,[10] and further to protect U.S. workers by ensuring that foreign workers do not depress wages, working conditions, or fringe benefits for U.S. workers.

Asif authorized a fairly low level employee[11] of one of his convenience stores to sign the LCA, and in doing so, declared that "By signing this form, I on behalf of the employer attest that the information and labor condition statements provided are true and accurate; that I have read the Sections E and F of the cover pages (Form ETA 9035CP), and that I agree to comply with the Labor Condition Statements as set forth in the cover pages and with the Labor Department regulations (20

---

[8] *See generally* 20 C.F.R. § 655.700, which discusses the statutory bases that govern this and similar programs; *Cyberworld Enterprise Technologies, Inc. v. Napolitano*, 602 F.3d 189 (3rd Cir. 2010).

[9] 8 U.S.C. § 1182(n) deals with labor condition applications.

[10] 20 C.F.R. § 655.705(c)(1).

[11] At trial, it was clear this employee knew absolutely nothing about what she was signing.  Her education level was low, and when she was examined about the underlying program, it was clear these documents had been handed to her to sign and so she signed them, no questions asked.  There is no possible way she drafted these documents.  Putting her on the stand to suggest she, and not Asif, was somehow responsible for creating these documents, or for any errors, was not fruitful or persuasive on this point.

4

CF part 655 Subpart H and J)."[12] The LCA also stated "I understand and agree that, by filing the LCA . . . I am attesting that all statements in the LCA are true and accurate and that I am undertaking all the obligations that are set out in the LCA and the accompanying instructions."[13]

On May 25 and June 1, 2005, under the H-1B program, Asif and Mahaom LLC, through their accountant Ajay Dave, filed an LCA and I-129 Petition seeking to bring Ghulam Hussain ("Hussain") into the United States to work as a financial manager for Mahaom LLC for a three year period beginning October 2005. The Petition certified, under penalty of perjury, that the job duty for Hussain was "financial manager." It further required a salary of $44,429, and represented that 100% of his duties would be to "direct the preparation of financial reports."[14] Attachments to the LCA described Hussain's expected working conditions to be "in comfortable offices, often close to top managers" with "direct access to state of the art computer systems and information services."[15]

According to Asif, he intended to start a fuel distribution business to aid in the profitability of his convenience stores/gas stations. He believed that such a fuel distribution business would allow him to capture the profits that were now going to the fuel distributor that provided gasoline to his stores. The description of the Mahaom, LLC business contained in the DOL paperwork was that it consults, develops, manages and operates businesses, researches market regarding viability of such franchises and its operations. Because of that business, it contended it needed "superior financial analysis and marketing," which Hussain was to supply.

---

[12]Exhibit 1, p. 5 (emphasis added).

[13]*Id*. at p. 2.

[14]Exhibit 14, p. 2; Transcript. pp. 110-111 (hereafter "Tr.").

[15]Exhibit 14, p. 5. Asif or Dave ultimately sent Hussain a picture or pictures of this "comfortable office," which he never occupied once he got to the United States.

5

At Asif's direction, 38 identical Consulting Contracts with different company names, all signed by his wife, Uzma Shahzadi, were attached to demonstrate that there was adequate work for a finance manager at Mahaom, LLC. No services were ever performed by Hussain, or anyone else, in furtherance of those purported contracts.[16] In fact, at trial, both Asif and his accountant, Dave, testified they only needed this financial manager for the gasoline wholesaler project, not for the secondary business represented on the attachments. The Consulting Contracts used as a supporting documents for Hussain's application, therefore, had nothing to do with the job Hussain was intended to perform. Asif tried to argue that the attachments referenced above were only submitted for the secondary business, but the Court finds the evidence is clearly otherwise.

### B. Facts relating to the second H-1B application

The alleged purpose of the secondary business was to sell gasoline to other area gas stations. And, in hopes of enticing other stations to bring their gasoline needs to Mahaom, Asif and Dave intended to provide additional consulting and business services to these stations. They believed the consulting aspect of the new business model for Mahaom required a second financial manager. Accordingly, on July 6, 2005, Asif submitted a second H-1B application, for an individual named Amir Latif ("Latif"), to work the other end of this business plan, again as "financial manager" at the same salary of $44,429, for the same three year period as in the first application.[17] Asif, as owner

---

[16]Tr. p. 518, Exhibits 19 and 21.

[17]The Court notes that at Asif's § 341 meeting on September 2, 2009, he denied participating in the H-1B program more than once, which also turned out to be false testimony. *See* Exhibit 107, p. 26; Tr. pp. 523-24. He tried to explain away this testimony by claiming that because the other worker's petition was later revoked, he did not really "participate" for that worker. He then testified that he simply "forgot" about this worker. Either version of the story might have been believable if this was the only false statement the Court heard; it was instead just one of many. *See also* Adv. No. 09-7061, Doc. 65, which is this Court's Order Granting Plaintiff's Motion Allowing Leave to File Amended Response in Opposition to [Asif's] Summary Judgment Motion and for Leave to Amend Pretrial Order, which details this Court's first exposure to Asif's false statements in this case, which occurred after entry of the original Pretrial Order.

6

of Mahaom, or Dave, similarly directed the low level employee to sign all the same documents, certifying their accuracy under penalty of perjury. Before he could come to the United States, however, Latif's visa was revoked when it was discovered that he had falsified his credentials.

The fuel distribution business never materialized, as Asif was unable to obtain financing to start that new venture. Asif knew no later than April or May 2006, months before Hussain's visa was even issued, that he could not get financing for either a fuel wholesale or consulting business for which a financial manager was supposedly needed.[18] Accordingly, at least 5 or 6 months before Hussain came to the United States, Asif knew he had no financial manager position for him.

Notwithstanding that fact, Asif and Dave continued to communicate with Hussain by email about the job and his visa,[19] but, according to Hussain, never informed him there was no financial manager position before he came to the States. None of the emails suggest the job was gone, and the Court simply found Hussain much more credible on this and all issues. Further, Asif and Dave continued to work with Hussain and the American consulate in Pakistan to complete the documentation needed for the H-1B visa well after they both knew the "specialty position" no longer existed.[20] At no time during this process did Asif, Mahaom, or any of its agents, notify anyone in the DOL, or at the H-1B program, or Customs, or the consulate that the financial manager position that might at one time have been available for Mr. Hussain would never come to fruition.

---

[18]Adv. No. 09-7061, Amended Pretrial Order, Doc. 74, Stipulation L; Tr. pp.141-43; Tr. pp. 428-30.

[19]Exhibit 29, pp. 16-21, Tr. pp. 259-66. In fact, Dave encouraged Hussain to contact the consulate, in June 2006 (several months after the purported need for a financial manager had disappeared) about the visa, and the Court has found that Asif was aware of, and authorized, Dave's contacts with Hussain.

[20]Adv. No. 09-7061, Amended Pretrial Order, Doc. 74, Stipulation K; Exhibit 29, Tr. pp. 260-65.

The visa was finally issued August 16, 2006 for Hussain to travel to the United States, and Asif arranged to pay for his airline ticket through a Pakistani travel agent. He arrived at the Kansas City airport on October 14, 2006. Accounts concerning the circumstances of Hussain's arrival in the United States varied significantly between Asif and Hussain. Asif testified that he or Dave told Hussain numerous times before he arrived that the financial manager position no longer existed and that he should not travel to the United States for that employment. He further testified that Hussain appeared unexpectedly at his door on or about October 14, 2006, at which time he reluctantly agreed to allow Hussain to live in his home, and to give Hussain a job as a cashier at the 29th Street Quick Stop. He also testified he paid him $550-$580 in cash each week for approximately 40 hours of work.[21]

Conversely, Hussain testified that he was never informed that the financial manager position was no longer available, and that in fact Asif sent him a photograph of the office area where he would supposedly work, as well as of the computer and laptop he would use. He testified that he came to the United States expecting to serve in that capacity at the required annual salary contained in the H-1B visa of $44,429. And contrary to Asif's claim that Hussain showed up unannounced at Asif's home, Hussain testified that Asif personally picked him up at the Kansas City airport and drove him to his home to live in his basement until he could obtain his own place.

Hussain claimed that upon starting work for Asif, he was taken to the 29th Street Quick Stop, trained how to use the cash register and told to learn the prices of the items in the store. He said he

---

[21] The Court finds—for many reasons—that nearly every aspect of Asif's testimony lacked credibility. One of the reasons is the fact that if Asif truly was paying Hussain between $13.75 and $14.50 per hour, as he claimed, for Hussain to serve as a cashier/stocker in his convenience store, this was twice the rate he payed his other employees for the same work. Asif could not and did not explain why he would pay Hussain upwards of 50% more than any other similarly situated worker. Another example is that documentary evidence showed that Asif arranged for Hussain's travel, further eroding Asif's testimony that he did not know Hussain was coming.

was informed that he needed to learn the clerk's duties because it was important for him to learn the business, top to bottom, before assuming his financial manager position. Hussain also testified that he was required to work approximately 80 hours per week for far less than minimum wage.[22] According to Hussain, Asif deposited just enough money into his bank account to pay for his rent and utilities (after Asif's wife asked him to help get Hussain an apartment so he would move out of their home), along with approximately $200 per month for food and all other needs.[23] At no time was he paid even close to the $44,420 salary Mahaom had pledged to pay him when applying for Hussain's H-1B visa.

Hussain eventually quit, on October 15, 2007. He and his family moved away from Kansas,[24] after which time he contacted the Kansas Department of Labor, claiming he had not been paid the wages required by law. Because he had come to the United States through a federal program, the state referred the matter to the DOL. Hussain ultimately filed a wage and hour claim against Mahaom in April 2008, alleging that he was not paid the amount Asif committed to pay him, and the amount required under the H-1B program (the local prevailing wage for a financial manager).

---

[22]Hussain testified he was required to open the store by 6:00 a.m. Monday through Friday, and worked until 4:00 or 5:00 p.m. those days. On the weekends, he was required to both open and close the store, requiring him to work from 6:00 a.m. to 11:00 p.m. Saturday and Sunday. Although Asif tried to counter this testimony by saying his brother in law worked some of these hours, he did not elect to call his brother in law as a witness, even though he apparently resides in the city where the trial occurred.

[23]Tr. pp. 270-71 and Exhibit 30 (showing varying amounts deposited in Hussain's checking account, which would corroborate these funds represented rent and utility bills, the latter of which would vary each month both by usage and season).

[24]There was conflicting testimony about whether Asif was holding Hussain's passport (and those of his child and wife) against his will, resulting in a physical confrontation when Hussain finally demanded them. Hussain's wife called the police (who in turn called the FBI) to get the passports from a locked safe deposit box at one of Asif's businesses. Once again, the Court finds Hussain's version of these events far more credible than Asif's. *See* Tr. pp. 274-75.

9

Interestingly, although Asif/Mahaom had numerous employees at all these convenience stores, he apparently paid his employees with cash, and kept no payroll records. One exception was a check Asif deposited directly into Hussain's bank account (on which he had signature authority) for $3,000, but which amount Asif then immediately withdrew from Hussain's account to pay Uzma Shahzadi that same amount.[25] In addition, during his entire year of employment, Hussain was given only one pay stub, which he apparently needed to demonstrate employment so he could qualify for an apartment lease.[26] Accordingly, Asif's testimony about Hussain's wages cannot be corroborated with normal payroll records one would expect to see in such a business.[27]

During its investigation, DOL determined that because Hussain actually worked as a cashier/stocker for Mahaom, as opposed to a salaried professional, his employment was not exempt from the requirement to pay overtime wages for any work in excess of 40 hours per work. In September 2009, it eventually obtained a judgment[28] in the United States District Court for the District of Kansas in the amount of $45,326.45 against both Asif and Mahaom for unpaid wages and overtime benefits. Neither defendant appealed, the judgment is a final order, and that is the amount of the debt subject to this § 523(a)(2)(A) claim.

### C.     Facts relating to Debtor's failure to keep books and records

---

[25]Tr. pp. 271-72; Exhibits 31 and 32.

[26]Tr. pp. 230-31 and 271-73. Asif had an interest in getting Hussain into an apartment because his wife finally requested he do so.

[27]Adv. No. 09-7061, Amended Pretrial Order, Doc. 74, Stipulation V ("Most of Mr. Hussain's compensation was paid in cash with no record keeping by the employer [Asif]").

[28]*Id*. at Stipulation AA; Exhibit 11.

10

Debtors closed their convenience stores by February 2009. The real estate and businesses owned by Mahaom LLC, located at 1320 SW 6th Avenue and 2701 SE California in Topeka, were sold to Alliance Petroleum LLC for a total sale price of $610,000 at the end of January 2009 (hereafter called "Alliance Petroleum Transaction"). Out of that sale price, Alliance assumed two loans in the amounts of $218,311.54 and $212,876.69. After crediting these assumed loans against the sale price, Mahaom received a cash sum of $170,218.83, which was wired to and deposited in a bank account owned by Mahaom LLC (again, owned 100% by these Debtors).

The Trustee solicited testimony that Asif wrote checks and/or withdrew cash from the bank where the Alliance Petroleum Transaction proceeds were deposited within nine days of that closing, as follows:

| DATE | AMOUNT |
|------|--------|
| 02/03/09 | $9,000.00 |
| 02/04/09 | $9,000.00 |
| 02/05/09 | $9,000.00 |
| 02/06/09 | $3,000.00 |
| 02/09/09 | $7,000.00 |
| 02/09/09 | $2,017.37 |
| 02/09/09 | $9,000.00 |
| Unknown Dates | Unknown Transfers |

Debtors also indicated on their Statement of Financial Affairs that of this $170,218, they used $119,270 to pay a fuel bill owed by Mahaom LLC to Lion Petroleum and $13,000 to pay a fuel bill owed by Maham Inc. to Lion Petroleum. Debtors indicated the remaining amount, which was nearly $38,000, was used to pay final bills for their other convenience stores prior to their closing. Debtors did not indicate, in response to Questions 3 and 10 of their SOFA, that they had paid any secured

11

lender upon the sale of the businesses. Debtors did provide the Trustee, however, at a second § 341 hearing, documents evidencing the automatic transfers of these funds to these entities.[29]

At his two § 341 meetings, Asif testified he used approximately $48,000 from the Alliance Petroleum Transaction to pay fuel bills. He also claimed to have paid tobacco product bills to Sant Joe and Shariam.[30]

Although Debtors filed bankruptcy only a few months after these payments were allegedly made, Asif allegedly retained no invoices or other business records to document the bills owed to Lion or Alliance, or to document any of the other debts Asif claimed he paid with these sale proceeds. In addition, he testified that he purposefully elected to destroy any and all books he had kept for these businesses, including any invoices or check registers, and that he had no electronic or other accounting system to corroborate the payments. Asif testified he discarded the records because he knew he could contact the vendors at a future date and get replacement copies if he ever needed them.

Because of that testimony that he could easily get replacement copies of anything needed, the Trustee made a written request in August 2009 for all documents related to the Alliance and Lion Petroleum transactions, including security agreements and promissory notes for two vehicles[31] and copies of the sales and related documents for the property sold to Alliance and Lion to document how and for what the proceeds were paid. A few documents were ultimately provided by Asif to his counsel after the discovery cut-off, and bank information from one of two loans was provided, again

---

[29]*See* Trustee's Exhibit 122-2.

[30]Trustee's Exhibit 107, pp. 21-22.

[31]Adv. No. 10-7007, Doc. 44, p. 7, ¶ O, Trustee's Exhibit 101.

12

after preparation of the Amended Pretrial Order and discovery cutoff, but considerable information about these transactions was never provided.[32]

This decision to discard these records immediately after the sale was in direct conflict with the advice his own accountant, Ajay Dave, had given to him. Dave testified, and Asif agreed, that Dave had advised Asif to retain all of his business records (including receipts and other documents necessary for preparation of tax returns) for five to seven years because Asif had previously been audited by taxing authorities, and Dave knew the number of years the IRS required records to be retained. Asif admitted he chose to ignore this advice because of his own personal belief he did not really need to retain the records.[33]

The Trustee also solicited testimony that during the year Hussain worked for Asif/Mahaom, Asif deposited $9,000 into Hussain's personal checking account (on April 9, 2007), and another $1,000 the next day. One day later, on April 11, a $9,900 wire transfer was made from Hussain's own checking account to an engineering firm in Lahore, Pakistan. Asif infers these were wages he paid to Hussain, but Hussain says he never received that money, that he is not from Lahore and has

---

[32]Interestingly, Asif claimed not to have the records, even though they were "destroyed" only 4 months prior to filing bankruptcy, but the testimony was he later filed the requisite federal and state tax returns for that year (which would have been due after the filing of bankruptcy). He admitted these same "destroyed" records would have been needed by his accountant, Dave, to prepare those returns. And here is yet another area of testimony where Asif changed his story in mid-stream, further eroding his already impaired credibility. He indicated that the missing business records were at his attorney's office, and then he said he had given them to the accountant and maybe he (Dave) never returned them. Dave testified he returned the records to Asif on or about June 19, 2009, and upon cross-examination, Asif suggested Dave's testimony was incorrect. As between Dave and Asif on this issue, Dave was the more credible witness. Thus, there was no credible evidence that Asif had turned over all the required invoices to his attorney or to the Trustee so she could verify what amounts were actually paid for fuel, to whom, and on what dates.

[33]The Court also notes that Asif's Statement of Financial Affairs indicates he first consulted bankruptcy counsel about filing this bankruptcy case (his second, the prior having been filed in 2000), on April 29, 2009, only 2 months prior to filing (and seven days after he was sued in federal district court by DOL). *See* Exhibit 104, p.38. So it appears likely that Debtor knew he was going to be filing bankruptcy when he elected to discard these material records. In addition, because Debtor had previously been through the bankruptcy process, he had more information about what a bankruptcy trustee would require than someone who had never been through that process. This causes the Court to wonder whether he discarded them for the purpose of denying the trustee the records she needed to trace these sale proceeds.

13

no family or friends there, and that he did not transfer these funds. Conversely, both Asif and his wife went to high school in Lahore, they were married in Lahore, and numerous friends and family members resided there during this time.[34]

Although the testimony was clear that Hussain had nothing to do with these deposits, and Asif was the only other signatory on this bank account, Asif denied he had anything to do with these deposits. The Court finds that testimony also lacking in credibility.

The ownership of the various companies owned by Debtors was explored, and although Debtors testified at their § 341 hearing that they were 50/50 owners in all the business, the tax returns for the entities indicated differently. In every instance the companies were wholly owned by them, but the percentages were significantly different than they disclosed.

At trial, Asif also called several friends and acquaintances to testify that they had loaned Asif cash in the past, and that he had repaid them—also in cash—out of the proceeds from the sale of the convenience stores. These personal cash loans were supposedly in the amounts of $15,000,[35] $5,000, $6,000, $9,000 and $13,000, and not a single loan was evidenced by any writing or receipts.[36] Every witness testified, in lockstep fashion, that 1) the loans were purely cash transactions given to Asif

---

[34]It was odd that Asif split the $10,900 transaction into two, on two separate dates, so it was below the $10,000 threshold. This may have been a transfer of assets to one of Asif's family members that for whatever reason Asif wanted to keep off the books as it related to him, as the Trustee suggested. Transferring assets to a family member is one of the badges of fraud.

[35]Although each witness made a special point to testify that as between friends, they would never charge interest, Debtor never explained why he repaid one of the friends $18,000 when the original loan was only $15,000. *See* Tr. pp. 192 and 621. Similarly, on the Alam loans totaling $13,000, Debtor testified he repaid that $13,000, but the withdrawals he alleges represent those loan repayments only reflect $12,000. *See* Tr. pp. 621-22 and pp. 391-393. These are just two more examples where the Court found Asif's testimony lacked credibility.

[36]Hussain testified that nothing in the Muslim faith or the Koran suggests one would not keep at least personal records of loans made to another, and that it is best if you do make a writing so there is no question what you borrowed or loaned.

14

on his personal guarantee that he would repay the debts; and 2) that in their culture, they loan money to anyone else in their culture who they know needs the money, without evidence of the debt or repayment terms.[37]  Asif testified that he elected to repay his friends, rather than the thousands of other debts he owed others, because he did not want his wife to know that he had needed to borrow the money from his friends prior to the filing of the bankruptcy.[38]

Finally, the following fact pattern provides further evidence why this Court is convinced that Asif lied continuously during the trial.  Although Hussain worked for Asif until October 15, 2007, Asif wrote a letter dated September 6, 2007 to the U.S. Consulate in Islamabad, Pakistan requesting revocation of Hussain's visa.  In that letter, he stated that "the beneficiary [Hussain] never reported to work after landing in USA."[39]  At this point in time, Hussain had been employed by Asif's company for almost 11 months, including a few month's stay in Asif's own home.  Asif then sent a second letter, immediately after the confrontation over the passport and Hussain's departure, on October 20, 2007.  This letter was sent to the Department of Homeland Security withdrawing

---

[37]None of these loans was disclosed on Debtors' SOFA because they occurred more than 90 days before filing bankruptcy.

[38]His sworn testimony at trial about who he paid with the loan proceeds differed from his sworn testimony during the § 341 hearings.  He tried to explain away his § 341 false testimony by saying he did not want his wife to know he had taken out these private loans.  But by that time, they had both had to file for bankruptcy, so it was no secret to his spouse that he owed hundreds of thousands of dollars.  Thus, the Court does not find it believable that is why he lied, and even if so, it was not justifiable.  Again, Debtor Asif changes his testimony depending on who his audience is, so when this Court is faced with deciding whether to believe Asif over other witnesses who did not display this same disregard for the oath they took, the Court has no difficulty believing the other witness in almost every instance.  *Compare* Exhibit 107, pp. 21-22 with Tr. at p. 629.

[39]Adv. No. 09-7061, Amended Pretrial Order, Doc. 74, Stipulation EE; Tr. pp. 431-33; Exhibit 24.

15

Hussain's H-1B petition, and it again falsely stated that that "[t]he beneficiary never reported to work after landing in USA."[40]

Additional facts will be disclosed below, when necessary.

## II.    CONCLUSIONS OF LAW

### A.    DOL's claim for unpaid wages is non-dischargeable.

The first issue is whether the debt owed by Asif to the DOL should be excepted from discharge pursuant to § 523(a)(2)(A). In 2009, the DOL filed a lawsuit against Mahaom and Asif seeking damages for unpaid wages and overtime benefits on behalf of Hussain. The DOL obtained a $45,326.45 judgment, jointly and severally, against Asif and Mahaom. In that litigation, although Asif was properly served, he elected not to defend the action.

#### 1.    Preliminary matters raised by Asif

Asif now wishes to raise, in this litigation, defenses that he should have, and could have, raised in the federal district court action. First, he suggests that because DOL elected not to bring an administrative proceeding against him, personally, before bringing the action in federal court, DOL was somehow estopped from bringing the action against him in federal court that resulted in a money judgment. He provides no citation to authority for this position.

---

[40]Adv. No. 09-7061, Amended Pretrial Order, Doc. 74, Stipulation HH; Tr. pp. 433-35; Exhibit 25. When Asif retained a lawyer to handle the DOL matterr, the lawyer sent a letter to U.S. Immigration and Naturalization Service, dated December 17, 2007, retracting only the September 6, 2007 letter. He then claimed he terminated Hussain on October 15, 2007. *See* Adv. No. 09-7061, Amended Pretrial Order, Doc. 74, Stipulation GG; Exhibit 26.

16

Even if he had authority to support that argument, this is a defense he should have timely raised in that litigation. He is precluded from now raising potential defenses to DOL's federal district court litigation under the principles of *res judicata*.[41]

Similarly, Asif belatedly argues that DOL can only bring this kind of wage and hour claim against the actual employer, and claims either Mahaom, or even his accountant, Ajay Dave, was Hussain's true employer. Again, the Court finds that Asif is precluded from raising this issue now, again because he failed to raise this defense in the DOL case.

Asif also argues that perhaps the District Court did not have jurisdiction to hear that case under either Section 17 of the Fair Labor Standards Act or 28 U.S.C. § 1345. Once again, the jurisdiction to hear that case was not raised in that proceeding, and it is too late to now raise this as a defense to that judgment.

Asif then tries to undermine the amount of the judgment entered against him by the District Court by presenting evidence that he actually paid Hussain wages in excess of what he was credited by the District Court when it calculated damages. Asif was required to raise in that proceeding any argument regarding the amount of his liability. Because he did not challenge the numbers presented by DOL, and because he elected not to appeal the decision after it was entered, he is barred from making these arguments here. The Court cannot allow Asif to do through the back door of this litigation what he declined to do through the front door via a proper defense of the district court litigation, or a timely appeal of the adverse decision entered against him.

---

[41]*Reed v. McKune*, 298 F.3d 946, 950 (10th Cir. 2002) (holding that the doctrine of res judicata prohibits litigation of certain claims based on the resolution of an earlier action between the same parties. "Under res judicata, a final judgment on the merits of an action precludes the parties ... from relitigating issues that were or could have been raised in that action,") (quoting *Allen v. McCurry*, 449 U.S. 90, 94 (1980)).

17

Finally, Asif argues that DOL effectively does not have standing to bring this § 523(a)(2)(A) action because if he made any misrepresentation, which he denies, it was to Hussain, not the DOL, and Hussain failed to bring an action within the time allowed by Fed. R. Bankr. P. 4007(c). In other words, he argues only Hussain is a creditor, rather than DOL, and thus it has no claim upon which a dischargeability action can be pursued. Section 523(c)(1) does limit standing to bring § 523(a)(2)(A) actions to "the creditor to whom such debt is owed."

As DOL correctly notes in its submissions, however, the H-1B program is statutorily designed to authorize DOL to bring actions against those who violate the program,[42] and DOL did so here. In fact, once DOL has initiated a case on behalf of a victim, the victim expressly has no private right of action under 8 U.S.C. § 1182(n),[43] and Asif does owe a debt to DOL.

Accordingly, the Court finds that the Secretary has the statutory authority to seek the nondischargeability of this debt. She is the party entitled to payment of the money judgment, and she is the only party with authority to bring this action. Mr. Hussain remains the statutory beneficiary to receive the back pay award,[44] but the Secretary is the proper party plaintiff.[45]

---

[42] A statute can create a cause of action that gives rise to a "claim" or "debt" under the Bankruptcy Code.

[43] *Watson v. Bank of America*, 196 Fed. Appx. 306, 307-08, 2006 WL 2482845, 1 (5th Cir. 2006). Section 216(b) of Title 29 provides that once the Secretary brings the action, the rights of an individual to become a party plaintiff are terminated.

[44] *Brennan v. Heard*, 491 F.2d 1, 4 (5th Cir. 1974), *overruled on other grounds*, *McLaughlin v. Richland Shoe Co.*, 486 U.S. 128 (1988).

[45] *Cf. Herman v. Egea (In re Egea)*, 236 B.R. 734, 742-43 (Bankr. D. Kan. 1999) (denying debtor's motion to dismiss on the basis that DOL did not have standing to bring a § 523(a)(4) action against the debtor for misappropriating funds from an ERISA-qualified employee benefit plan, holding that "whenever Congress designates a public agent as responsible for enforcing federal laws in the public interest, the agent comes within the ambit of a 'creditor to whom such judgment is owed'") (citing *SEC v. Hodge (In re Hodge)*, 216 B.R. 932 (Bankr. S. D. Ohio 1998) (holding SEC is proper plaintiff to bring § 523(a)(2)(A) action)). *See also SEC v. Maio (In re Maio)*, 176 B.R. 170 (Bankr. S. D. Ind.1994) (holding SEC had standing to prosecute dischargeability action even though it would not be recipient of monies owed by the debtor; *In re Austin*, 138 B.R. 898 (Bankr. N. D. Ill.1992) (holding FTC has standing under 11 U.S.C. § 523(c) as the representative of defrauded individuals). Most courts finding the existence of standing by the federal agency rely

18

## 2.    Analysis of DOL's § 523(a)(2)(A) claim

The burden of proof rests with the party opposing discharge.  Thus, in this case, DOL has the burden of proof, by a preponderance of the evidence.[46]  Discharge provisions are strictly construed against the objecting creditor.  Because of the fresh start objectives of bankruptcy, doubt is to be resolved in the favor of debtors.[47]  Courts typically look for specific indicia of fraud, often referred to as "badges of fraud," when analyzing a case under § 523(a)(2)(A).[48]  However, when analyzing a case in light of these badges of fraud, the Court must be mindful that these cases are peculiarly fact specific, and the conduct in each case must be viewed individually.[49]

The DOL claims that the debt it is owed is non-dischargeable pursuant to § 523(a)(2)(A), which provides as follows:

> (a) A discharge under section 727 ... of this title does not discharge an individual debtor from any debt—
>
> * * *

---

on the United States Supreme Court case of *Nathanson v. NLRB*, 344 U.S. 25 (1952) (holding NLRB qualified as a creditor under the Bankruptcy Act, and had standing to pursue an action against an employer for back pay owed to its employees, stating that the NLRB was the "public agent chosen by Congress to enforce the National Labor Relations Act").

[46]*See Grogan v. Garner,* 498 U.S. 279, 291 (1991) (holding that preponderance of the evidence standard, not clear and convincing standard, applies to all exceptions to discharge).  *See also In re Busch*, 369 B.R. 614, 623 (10th Cir. BAP 2007).

[47]*Bellco First Fed. Credit Union v. Kaspar (In re Kaspar)*, 125 F.3d 1358, 1361 (10th Cir. 1997).

[48]Actions from which fraudulent intent has been inferred include situations in which a debtor conceals pre-bankruptcy conversions, converts assets immediately before the filing of the bankruptcy petition, gratuitously transfers property, continues to use transferred property, and transfers property to family members.  Courts also consider the monetary value of the assets converted, whether the debtor obtained credit in order to purchase exempt property, whether the conversion occurred after entry of a large judgment against the debtor, whether the debtor had engaged in a pattern of sharp dealing prior to bankruptcy, and whether the conversion rendered the debtor insolvent.  *Cadle Company v. Stewart (In re Stewart)*, 263 B.R. 608, 611 (10th Cir. BAP 2001).  Many of these apply to the facts of this case.

[49]*Id.*

19

(2) for money, property, services, or an extension, renewal, or refinancing of credit, to the extent obtained by—

> (A) false pretenses, a false representation, or actual fraud, other than a statement respecting the debtor's or an insider's financial condition.

In order to prevail on a claim under § 523(a)(2)(A), a creditor must prove, by a preponderance of the evidence, that (1) the debtor made a false representation, (2) the debtor had the intent to deceive the creditor, (3) the creditor relied on the debtor's conduct, (4) the creditor's reliance was justifiable, and (5) the creditor was damaged as a proximate result.[50]

The DOL asserts that Asif, through his company Mahaom, LLC, filed a false LCA and a false I-129 Petition in support of a visa application to employ Hussain. The parties stipulated that Asif represented during the visa application process that Hussain would be hired as a financial manager, would have specific duties exclusively relating to accounting and financial operations for Mahaom, Inc., and would be paid approximately $44,000 annually to perform those specific duties. However, after applying for the H-1B visa for Hussain, Asif instead employed Hussain as a cashier/stocker at one of Asif's convenience stores. Hussain never worked as a financial manager for Mahaom.

Asif admits that the financial manager position never came to fruition, and that Hussain never worked as a financial manager for Mahaom, or any other company owned or operated by Asif. However, Asif claims that at the time he submitted the H-1B application, it was his honest intent to create that position for the fuel distribution business and for Hussain to serve as the financial manager for that company. Asif testified he thought the company would operate as contemplated until he learned that he could not obtain bank financing to fund the project. Asif claims that he

---

[50] *Johnson v. Riebesell (In re Riebesell)*, 586 F.3d 782, 789 (10th Cir. 2009).

contacted Hussain at that point to inform him of this development, and to advise him not to come to the United States because the job no longer existed.

Asif further claims that Hussain insisted on coming to the United States, and showed up at Asif's front door, unannounced, despite Asif telling him not to come.[51] Asif then allowed Hussain to work for his company in the only position available, cashier/stocker, in an effort to aid a fellow Pakistani now that he was in the United States.

The Court finds that DOL did not sustain its burden to prove that Asif intentionally made false or misleading statements at this initial stage of the process to obtain a visa for Hussain to enter the United States. Asif's testimony concerning the creation of the fuel distributor business was believable mostly because it was corroborated by other evidence. First, Ajay Dave's testimony concerning the creation of the distribution business matched Asif's testimony, at least on this aspect of the case. In addition, documentary evidence was admitted demonstrating Asif's attempts to obtain financing for this business venture. The timeline created with the application to bring Hussain to the United States to work as a financial manager and the application for credit to begin the fuel distributor business were also consistent.

The Court also finds that the representations Asif made concerning the second H-1B application for Latif were satisfactorily explained. Contrary to the assertions made by the DOL, Asif testified that Latif was to be hired to occupy a different financial manager position than the one Hussain was to hold. The business model needed two separate financial managers: one for the fuel

---

[51] Hussain disputed this claim. Hussain testified that it was Asif who purchased his plane ticket to the United States and told him where in Pakistan to pick up the ticket. Hussain also testified that it was Asif who personally drove from Topeka to Kansas City, a distance of over 60 miles, to pick him up at the airport in Kansas City upon his arrival in the United States. Hussain's testimony on this subject was by far the more credible.

distribution operation, and the other to handle the side-business of tax and financial consulting to customers of the distribution operation. Therefore, the Latif application does not necessarily cast suspicion over the Hussain application.

Although the Court finds that DOL did not prove that Asif made intentionally false or misleading statements in the initial LCA or I-129 Petition to bring Hussain to the United States, the inquiry does not end there. As noted by the DOL, Asif's obligation to provide truthful information under the H-1B program did not end with the filing of those documents. Asif was under a continuing duty to inform the federal government of any significant changes to the employment of Hussain, including filing a new LCA in the event of significant changes in job duties.[52]

Testimony from DOL's investigative agent confirming this duty is corroborated by specific federal regulation, specifically 8 C.F.R. § 214.2(h)(2)(i)(E). That regulation unequivocally requires that

> "[t]he petitioner shall file an amended or new petition, with fee, with the Service Center where the original petition was filed to reflect any material changes in the terms and conditions of employment or training or the alien's eligibility as specified in the original approved petition. An amended or new H-1C, H-1B, H-2A, or H-2B petition must be accompanied by a current or new Department of Labor determination. In the case of an H-1B petition, this requirement includes a new labor condition application."

The Court can think of no more "material change[] in the terms and conditions of employment" than the fact that the advertised job no longer existed.

Asif disputes he had a duty, arguing that nothing in the H-1B program required him to notify DOL of any changes after he submitted the original paperwork. He relies on 20 C.F.R. § 655.731c)(7) to support this argument. That regulation provides that if the H-1B employee is not

---

[52]Testimony of DOL employee, Daryl Laurie at Tr. 55-56.

performing work due to a decision of the employer, the employer must nevertheless pay the worker the prevailing wage. He contends this was his only duty, and thus he had no duty to tell DOL that the job that was the entire basis for the application no longer existed (before Hussain's visa was ever issued), and that Hussain was not working in the occupation, or at the wages, upon which his H-1B visa was conditioned. In so arguing, he overlooks the cited regulation.

The H-1B program did require Asif to notify DOL of the fact that an allowed position under the H-1B program no longer existed, since the statute and regulations implementing the program require, as critically material conditions, that a nonimmigrant worker not take a "non-speciality" job that an American can perform, and that he not occupy a job at below minimum wage, which could serve to give the employer a competitive edge, and could depress wages.

And in fact, this is exactly what happened after Asif failed to disclose that conditions had changed. Hussain was issued a visa he should never have been given, and this allowed Asif to employ Hussain at wages significantly below minimum wage. This gave him and his company a competitive advantage over other convenience store businesses in the area. Further, giving that job to Hussain meant it was not available for an American (and in fact, two Americans since this Court believes Hussain's testimony that he was working close to 80 hours each week). The Court agrees with DOL that a change of the type of work the H-1B worker would occupy was such a substantive changes in employment that it actually required Asif and Mahaom to file an entirely new petition pursuant to 8 U.S.C. § 214. Accordingly, had Asif notified DOL, it would have denied the visa (and required a new petition if another such job later became available), since the job where Asif ultimately placed Hussain was not an allowed position under the program.

23

Asif did not notify anyone in the federal government that the financial manager position no longer existed prior to Hussain coming to the United States.[53] Asif also did not inform anyone that Hussain, upon his arrival in the United States, was being employed as a cashier/stocker at the 29th Street Quick Stop rather than as the financial manager upon which issuance of the visa was conditioned. Asif similarly did not inform anyone that Hussain was working for wages significantly below those required by his H-1B visa, and with working conditions that in no way resembled those that Asif, as owner of Mahaom, had represented to Hussain or DOL. And Asif did not pay Hussain the wages required pursuant to the regulation upon which Asif relies to exonerate him from his duties.

Although Asif knew at least by April/May 2006, when the bank rejected his financing requests, that the original premise for the application for Hussain had evaporated and he could no longer meet the statutory requirements of the program, the first time he took it upon himself to notify the federal government that there was any issue, whatsoever, with the Hussain visa was when he personally signed and sent a letter on September 6, 2007.[54] That letter, addressed to the U.S. Consulate in Islamabad, Pakistan, was sent almost 11 months after Hussain moved in with Asif and began working for Asif at one of his convenience stores. It requested the revocation of Hussain's visa, and the basis for this request was his assertion that Hussain had never reported to work in the United States. This letter's content was completely fabricated; even Asif stipulates Hussain had worked directly for him since late October, 2006.

---

[53]Tr. pp. 430-31.

[54]Tr. pp. 429-432, 437; Exhibits 24 and 25.

The second time Asif contacted the government was October 20, 2007 when he wrote to USCIS. This time he requested the withdrawal of his company's H-1B Petition. In this letter, he once again lied to the U.S. government, restating that Hussain had never reported to work upon arriving in the United States. Only when Asif hired a lawyer to represent him on DOL's potential claim did he attempt to correct at least one of these intentional false statements.

On December 17, 2007, Shannon Oury, Asif's attorney at the time, sent a letter to USCIS retracting the September 6, 2007 letter. This letter admitted that Hussain had, in fact, reported to work, but now claimed Asif had terminated his employment on October 15, 2007. These letters are demonstrative evidence of what this judge witnessed first-hand at the trial: Asif has no trouble lying when he thinks he can gain an advantage by doing so,[55] or when he wishes to punish someone, as he undoubtedly wished to punish Hussain for finally complaining about his wages, and ultimately reporting him to DOL.

The Court finds that Asif's failure to inform the federal government that the financial manager position was no longer available prior to Hussain's arrival in the United States, or that Hussain was actually being employed as a cashier/stocker at the 29th Street Quick Shop for wages considerably below what was represented in the H-1B visa process, constitute intentionally false statements made by Asif. Silence or concealment may constitute the requisite "false pretenses," for

---

[55] Another example that Debtor had no difficulty lying to the government was demonstrated in discussions regarding his 2007 tax return for Mahaom. He originally signed the return claiming he had paid no salaries. Asif, at some point in time after he was confronted by DOL about underpaying, Hussain, created a W-2 showing he had paid him wages in excess of $30,000. The Court believes he did not pay those wages, but the importance of this point is that after the DOL matter arose, he then amended his 2007 tax return to show he had paid that wage, after all, so he would have a defense to the DOL suit. *See* Exhibit 140. So he signed the tax return under penalty of perjury showing no wages, but when it would help him in the DOL suit, he amended the return to show he had paid wages, which amendment he again signed under penalty of perjury.

nondischargeability purposes, if the debtor has a duty to disclose the concealed facts.[56]  And the

letters Asif ultimately sent to DOL and USCIS in September and October 2007 demonstrate that he

knew he had a duty to disclose pertinent information about an H-1B application and employee to the

government.  They also demonstrate that Asif well knew how to contact DOL and/or USCIS to

discuss H-1B program issues.

Finally, his attempts during trial to cast off responsibility for his acts on to his accountant,

Dave, were non-persuasive.[57]  He had a duty to disclose pertinent information to DOL, he knew how

to fulfill that duty, and he had a motive not to disclose this information.  Non-disclosure enabled him

to have a below-minimum wage employee who would work 80 hours a week for less than half the

wages he would have to pay to an American worker, thus resulting in financial gain to him.

The second element of the § 523(a)(2)(A) test requires a plaintiff to prove that the false

statement/false pretenses were intentional.  The Court finds that Asif intended to deceive DOL when

he failed to notify DOL of these material changes.  Intent to deceive may be inferred from the totality

---

[56] *In re Khafaga*, 419 B.R. 539, 546 (Bankr. E.D.N.Y. 2009) (holding that conscious deception and concealment of material information may constitute false pretenses under § 523(a)(2)(A)), citing *In re Weinstein*, 31 B.R. 804, 809 (Bankr. E.D.N.Y. 1983) for the proposition that "[a]s distinguished from false representation, which is an express misrepresentation[,] false pretense involves an implied misrepresentation or conduct intended to create and foster a false impression.."); *In re Sielschott*, 332 B.R. 570 (Bankr. C.D. Cal. 2005).  *See also Holiday Rambler Corp. v. First Nat. Bank & Trust Co. of Great Bend, Kan.*, 723 F.2d 1449, 1453 (10th Cir. 1983) (noting that under Kansas law, courts often look to all the surrounding facts and circumstances to see if there exists some "artifice, trick [or] design," or "an act of deception or cunning intentionally and effectively used to cheat a person of his rights.").

[57] In addition, a court may consider conduct at the time of any representations as well as subsequent conduct to discern intent.  *See Farmer's State Bank v. Diel (In re Diel)*, 277 B.R. 778, 782 (Bankr. D. Kan. 2002) (holding that subsequent conduct, to the extent that it provides an indication of debtor's statement of mind at the time the representations were made, is relevant and may be considered).

26

of the circumstances,[58] and not necessarily by direct evidence, and the circumstances here fully support the inference.

The Court believed Hussain's testimony that Asif required him to work upwards of 80 hours a week at far less than minimum wage, which wages he would have had to pay a nonimmigrant worker. This allowed Asif to make higher profits for his company and himself by using this cheap labor. Thus, Asif had every monetary incentive to get such a worker to the United States. And as even Asif argues, most nonimmigrant workers are used to earning almost nothing for their hard work—at least according to America's standards—and if Asif could get Hussain to the States, he likely figured he could keep him and pay him much less than he would have to pay anyone else.[59] This is especially true since the Court also finds he took control of Hussain's passport and made it difficult for Hussain to leave, even threatening to harm him when he left.

The third element of the § 523(a)(2)(A) test requires that the creditor relied on the representation. The two LCA packets for two financial manager jobs were complete and contained no obvious inaccuracies or errors on the forms checked for by DOL under 8 U.S.C. § 1182(n)(1)(G). Unless an LCA is incomplete or is obviously inaccurate, the Secretary is to provide certification to proceed with the H-1B application. I-129 Petitions for visas were then filed with USCIS specifically for Ghulam Hussain and Amir Latif. Extensive supporting documents were sent in support of the

---

[58]*In re Riebesell*, 586 F.3d at 791 (citing *Fowler Bros. v. Young (In re Young)*, 91 F.3d 1367, 1373 (10th Cir.1996)).

[59]Asif makes this argument to suggest his version of the facts was true—that Hussain understood there was no accountant job for him, but was making almost nothing in Pakistan and thus was willing to come to the United States even if it meant a low level job. The Court finds that by bringing Hussain to the United States for a professional level job that did not exist, Asif actually deprived Hussain of the opportunity to find a legitimate H-1B employer elsewhere in the United States, the same way he had found this job (on an internet employment website). There is simply no credible evidence that Hussain elected to come knowing the nature and salary of the job he ultimately received.

27

petitions for both workers, including the multiple Consulting Contract Agreements, the Business Plan, the cover letters detailing the extensive work that the company was doing, the corporate officer chart, and the attachment detailing that each of the job positions would entail only preparation of financial reports.[60]  Hussain's H-1B visa was issued on August 16, 2006, and Ghulam Hussain came to the United States to work as a financial manager on October 14, 2006.

Nothing was received from Asif or Mahaom, LLC to indicate that there were any changes in the proposed job or work, and the package of material sent induced the government to believe that a specialty position was ready for Hussain to fill when that visa was issued.  Accordingly, DOL did rely on these documents to submit the visa, and further relied on Asif's silence, as President of the company seeking the employee, inferring that nothing had changed in the interim.  Had Asif timely and accurately informed DOL of the changes in Hussain's potential employment, the Court has no doubt that Hussain would not have been allowed to enter the United States under the H-1B visa to work for Mahaom.

The fourth element of the § 523(a)(2)(A) test is the creditor's reliance must be "justifiable." The standard is whether the creditor's reliance is "justifiable" from a subjective standpoint.[61]  "In determining whether a creditor's reliance was justifiable, a court should therefore examine 'the qualities and characteristics of the particular plaintiff, and the circumstances of the particular case, rather than [applying] a community standard of conduct to all cases.'"[62]

---

[60]*See* Exhibits 14-21.

[61]*In re Riebesell*, 586 F.3d at 791 (relying on *Field v. Mans*, 516 U.S. 59, 74-75 (1995)).

[62]*Id*. at 792 (quoting *Field v. Man*, 516 U.S. at 71).

28

The Court has no doubt that the DOL justifiably relied on Asif to provide this information, and did not act to revoke Hussain's petition, or stop issuance of his visa, based on its justified belief that there were no material changes in Hussain's proposed employment. In addition, the government would not have issued a visa under the H-1B program for Ghulam Hussain, a man with a masters degree in economics,[63] to work 80+ hours per week as a convenience store clerk at approximately $2.20 per hour. Any reasonable person with Asif's experience would have known this. The government relied on the attestations and certifications made in the applications in this voluntary program, and it was justified in relying that there had been no material changes in the application for this voluntary program.

Finally, Plaintiff must prove that the damages sustained were the proximate result of the false representation. DOL proved that Asif's failure to disclose that he no longer had the specialty job for Hussain, and his failure to pay Hussain the wages associated with that job even after the job evaporated, was the direct result of the damages for unpaid wages. The claim for unpaid wages would never have arisen had Asif timely informed the federal government that the specialty occupation no longer existed. The visa would never have been issued, and Hussain would not have worked 80 hours each week for almost a year at sub-standard wages.

Asif makes one final argument why he should prevail in this action. He argues that DOL had the opportunity to seek, at the administrative or district court level, civil penalties against him if his actions were truly willful or intentional, and it elected not to do so. He then suggests that DOL's decision not to seek civil penalties is "strong evidence that Plaintiff did not believe there had been any willful misrepresentations of any material facts in connection with the LCA application

---

[63]Exhibit. 3.

submitted for Mr. Hussain's employment."[64]  The Court finds Asif's logic unsupported either by law or public policy.

First, Asif provides no caselaw support for this theory, and the Court has found none. Second, when the government decides what actions to bring, and against whom, among the panoply of offenses contained in the United States Code, it has been vested with broad discretion to conduct civil proceedings, including its power to select the charges to seek in a particular case.[65]  It is a quantum leap, without support, to argue that a decision not to seek additional penalties on top of other damages sought can or should be construed as an admission that the agency had determined it could not prevail if it did assert such a claim.  It could easily be that DOL was more concerned about being able to collect actual damages, so Hussain as the intended beneficiary would receive full recovery of his damages, than obtaining a larger judgment for penalties that might have only benefitted the Treasury.

Therefore, the Court finds that the DOL has met its burden of proving that the debt owed by Asif was procured by fraud and is non-dischargeable pursuant to § 523(a)(2)(A).  And although Asif tried to suggest the amount of the judgment obtained in federal court against him was inflated, he did not appeal the amount of that judgment when entered, and this Court is bound by the amount of the judgment found by the District Court.

## B.    Debtor Asif's discharge is denied pursuant to § 727.

---

[64]*See* Adv. No. 09-7061, Defendant's post-trial brief, Doc. 107 at p. 20.

[65]*Cf. United States v. Bradshaw*, 580 F.3d 1129 (10th Cir. 2009).  Although *Bradshaw* is admittedly a criminal case, this Court sees no difference in this proposition between enforcing a civil, or a criminal, statute.  The United States (and its agency, the Department of Labor) has the power and discretion to civilly prosecute, or not prosecute a particular defendant, and a given cause of action, and this decision is not evidence of anything about the merits of action.

30

The Trustee has objected to Debtor Asif receiving a discharge on the basis that (1) he failed to keep or preserve books, documents, records and papers from which his financial condition or business transactions might be ascertained, (2) he knowingly and fraudulently made a false oath or account in connection with his bankruptcy case, (3) he knowingly and fraudulently withheld from the Trustee books, documents, records and papers relating to Debtors' property or financial affairs, and (4) he failed to explain any loss of assets or deficiency of assets to meet his liabilities.

1. **The Trustee established that Asif failed to keep or preserve books, documents, records and papers from which Debtor's financial condition or business transactions might be ascertained.**

To state a claim under § 727(a)(3), the Trustee must show that Asif failed to maintain and preserve adequate records, and that the failure made it impossible to ascertain his financial condition and material business transactions.[66] "In order to deny discharge for failure to keep records the court need not find that the debtor intended to conceal his financial condition."[67] Although issues surrounding the denial of a debtor's discharge should ordinarily be viewed in a light most favorable to the debtor, "this generalization should be qualified by noting that the interests protected by section 727 'are those of creditors and that the debtor is required to take such steps as ordinary fair dealing and common caution dictate to enable the creditors to learn what he did with his estate.'"[68] "If the facts disclose an apparent breach of the debtor's duty to creditors to keep or preserve proper books or records and the debtor fails to establish facts and circumstances to justify the lack of records, a

[66]*Gullickson v. Brown (In re Brown)*, 108 F.3d 1290, 1295 (10th Cir.1997).

[67]*Meridian Bank v. Alten,* 958 F.2d 1226, 1234 (3d Cir.1992); *see also Razzaboni v. Schifano (In re Schifano)*, 378 F.3d 60, 70 (1st Cir. 2004) ("Under § 727(a)(3), a creditor need not prove a fraudulent intent, but only that the debtor unreasonably failed to maintain sufficient records to adequately ascertain his financial situation").

[68]6 Collier on Bankruptcy ¶ 727.03[1] (15th rev. ed. 2001) (quoting *Koufman v. Sheinwald*, 83 F.2d 977 (1st Cir. 1936)).

31

discharge should be denied."[69]  The records do not need to be kept in any particular form; however, they must be sufficient to "enable his creditors reasonably to ascertain his present financial condition and to follow his business transactions for a reasonable period in the past."[70]

The Court finds the Trustee has met her burden of establishing Asif failed to keep and maintain sufficient records to enable his creditors and the Trustee to ascertain material business transactions.  The business records that Debtor maintained (and later turned over) relating to the business operations were spotty, at best.  The majority of ordinary business records were apparently either non-existent, or were simply discarded by Asif.  Payroll records were not maintained, but tax returns were magically completed.  Asif claimed he had discarded invoices and other records the Trustee requested and needed, but managed to later put together tax returns for the 2009 tax year.  As to the sale of the Mahaom business, Asif was able to provide the Trustee with nothing more than documents dealing with Alliance Petroleum's purchase of certain convenience store real estate from Mahaom and a large and incomplete stack of invoices for fuel purchases.

Asif failed to keep any general accounting ledgers or invoices for other products sold, failed to keep cancelled checks, failed to keep inventories for his businesses, and failed to keep receipts.  It appears that most of these records, which are routinely kept by most businesses, were simply not kept in the course of Asif's business practices.  The limited business records that Asif claims he did keep were apparently discarded by him following the close of the businesses, despite express directions by his accountant, Ajay Dave, to retain the records in the event of another tax audit.[71]

---

[69]*Id.*

[70]*Mercantile Peninsula Bank v. French (In re French)*, 499 F.3d 345 (4th Cir. 2007).

[71]Asif or one of his companies was audited a couple of years earlier for irregularities in his or his companies' 2005, 2006, 2007 and part of 2008 tax years, and again in 2008 because of sales tax irregularities.

32

Asif also kept no documentation of the numerous personal loans he belatedly claimed he obtained from his acquaintances (some of whom seemed remote in closeness of the relationship to justify the size and informality of the loan), which loans were also conveniently repaid in cash from the sale of Mahaom's assets within just a few months of the bankruptcy. There were no promissory notes, no receipts for payment, no cancelled checks, no ledgers, no journal entries, no calendar entries—no documentation of any kind  This failure to keep records also prejudices a trustee's attempts to avoid preferences for the mutual benefit of all unsecured creditors, resulting in some creditors getting repaid 100% of their unsecured, while others receive nothing.  It also prevents the Trustee from quickly and accurately ascertaining if a debtor is actually making transfers to insiders, or simply pocketing the money.

Debtor contends that because the missing financial records relate to his business operations, rather than his personal finances, § 727(a)(3) cannot be applied to deny his individual discharge.  To support this argument, Debtor cites to several cases for the proposition that "[a]n individual debtor's failure to maintain books and records of a corporation is not in itself sufficient to deny that debtor a discharge under § 727(a)(3) because an objection to discharge must be based on the debtor's failure to produce books and records which depict the individual debtor's finances, not that of his or her corporation. "[72]

Debtor's theory is more fully explained in *Buckeye Ret. Co., LLC v. Bishop (In re Bishop)*,[73] which provides:

---

[72]*Krohn v. Cromer (In re Cromer)*, 214 B.R. 86, 99 (Bankr. E.D.N.Y. 1997).

[73]420 B.R. 841 (Bankr. N.D. Ala. 2009).

33

In the present case, however, Plaintiff did not allege that the corporate records Debtor failed to produce were necessary to determine the personal finances of the Debtor. This court believes that the absence of any such allegation coupled with the rule that § 727 must be construed strictly against any creditor and liberally in favor of the Debtor, requires a finding by the court that the Plaintiff failed to meet its burden of proof. The Plaintiff, by failing to show that the corporate records were necessary to determine the financial condition of the Debtor, failed to show that the Debtor did not produce records necessary to determine the financial condition of the Debtor.[74]

However, as explained even in *Bishop*, if "corporate records are necessary to determine the debtor's financial condition, and the debtor has not kept or preserved such records, the debtor's discharge should be denied pursuant to § 727(a)(3)."[75]

"Some courts have specifically stated that corporate records are relevant to denial of discharge proceedings where the 'financial condition of the individual debtor and the corporation are closely connected.'"[76] "Where the bankrupt . . . is the principal or a truly responsible officer of a corporation, and incurs substantial obligations as a result of corporate activities, he is required to keep books and records."[77]

Although the Debtor is correct that the Trustee has not specifically alleged that the corporate books and records were necessary to fully determine Debtors' personal finances, it is clear from the Pretrial Order, and from the evidence received at trial, that this is the case the Trustee was making. Debtors were the sole owners of the businesses in question and interchangeably used the funds from those businesses as their personal assets. Even Asif admitted at trial that he used the assets from the sale of Mahaom to pay fuel bills of another corporation he owned, A & U. He testified "[w]hen I

---

[74]*Id*. at 851-52.

[75]*Id.* at 851.

[76]*Id.* (quoting *Wachovia Bank v. Spitko (In re Spitko)*, 357 B.R. 272, 307 (Bankr. E. D. Pa. 2006)).

[77]*In re Halpern*, 387 F.2d 312, 315 (2nd Cir. 1968).

34

own all the companies I have the right whatever I want I can transfer the money."[78]  Asif also claims to have used the money from the sale of his businesses to repay personal loans to friends and acquaintances at a time when the businesses still owed hundreds of thousands of dollars in debt.

So not only did Asif keep poor and oftentimes non-existent records, he then ignored corporate formalities by using assets of one company to pay obligations of another (or to just pay himself).  All of this made it nearly impossible for this Trustee to do her job.  It most certainly made it more tedious and expensive.

Without being able to trace the financial history of Debtors' various businesses, it is impossible to fully understand Debtors' personal finances in this case.  For example, after the sale of the property held by Mahaom and the closing of the different convenience stores, Mahaom received a payment of over $170,000.  If any of that payment remained in Asif's possession or control on the date of filing of this bankruptcy, it could constitute property of the Debtors' bankruptcy estate, assuming Mahaom's own creditors had been paid.  Further, if any preferential or fraudulent payments were made with that money, the Trustee could institute a proceeding to collect those funds for the benefit of the estate.  The failure to keep business records in this case directly impaired the Trustee's ability to do her job, and for the creditors of the estate to determine Debtor's financial transactions.

Although the Trustee can admittedly attempt to seek records from third parties to determine if there were inappropriate dissipation of assets, preferential transfers, fraudulent transfers, or outstanding assets to be recovered, she is seriously hampered since she does not know the identity of many of the payees.  Again, she does not have this information because Asif elected, contrary to

---

[78]Tr. 630-31.

Case 10-07007   Doc# 69   Filed 05/13/11   Page 35 of 45

advice he received from an accountant, to either not keep the records in the first place, or discard them in the second place, or both. Accordingly, this is precisely the type of case that § 727(a)(3) is meant to address, and Debtor Asif's discharge is denied on that basis.

>    **2.    The Trustee has failed to show that Debtor Asif knowingly and fraudulently withheld recorded information in connection with this bankruptcy case.**

The next claim by the Trustee is that Asif withheld recorded information in connection with the bankruptcy case, and that his discharge should be denied pursuant to § 727(a)(4)(D). The Court finds that the Trustee failed to establish at trial that the recorded information she sought existed as of the date of the bankruptcy, or that it was in Asif's possession. In fact, the Trustee was successful in demonstrating that Debtor failed to keep and preserve appropriate business records, which formed the basis for the Court's denial of discharge under § 727(a)(3). In other words, if a debtor fails to keep records, it is difficult to also argue he should have turned over the records that were not kept.

>    **3.    The Trustee met her burden of showing that Debtor Asif knowingly and fraudulently made a false oath or account in connection with his bankruptcy case.**

The next claim by the Trustee is that Debtor Asif's discharge should be denied pursuant to § 727(a)(4)(A) because he knowingly and fraudulently made a false oath or account in connection with his bankruptcy case. That statute provides, in part, that "[t]he court shall grant the debtor a discharge, unless . . . the debtor knowingly and fraudulently, in or in connection with the case . . . made a false oath or account."[79] The primary purpose of § 727(a)(4)(A) is to ensure that dependable information is supplied to those interested in the administration of the bankruptcy estate so they can rely on that information to be true. Neither the Trustee nor creditors should have to independently

---

[79] 11 U.S.C. § 727(a)(4)(A).

36

investigate the facts to verify their accuracy.[80]  The Trustee and the creditors are entitled to honest and accurate "signposts on the trail" showing what property passed through the debtor's hands during the period prior to bankruptcy.[81]

The Trustee has the burden to prove that the debtor knowingly and fraudulently made an oath, and that the oath related to a material fact.[82]  She must show that (1) the debtor made a statement under oath; (2) the statement was false; (3) the debtor knew the statement was false; (4) the debtor made the statement with intent to defraud; and (5) the statement related to the bankruptcy in a material way.[83]  The Trustee must prove each one of these elements by a preponderance of the evidence.[84]

A false statement or omission within a debtor's schedules may qualify as a false oath under § 727(a)(4)(A).[85]  Intent may be inferred, and reckless indifference to the truth may rise to the level of fraudulent intent.[86]  Discharge will not be denied, however, when a false statement is due to mere

---

[80]*Job v. Calder (In re Calder),* 907 F.2d 953, 956 (10th Cir. 1990) (holding creditors are not compelled to conduct an extensive investigation of a debtor's assets and transactions, but rather may rely upon the information provided in the bankruptcy pleadings and schedules).

[81]*Job v. Calder (In re Calder)*, 93 B.R. 734, 737 (Bankr. D. Utah 1988).

[82]Fed. R. Bankr. P. 4005; *Job v. Calder (In re Calder),* 907 F.2d at 955 (*citing* 4 Collier on Bankruptcy ¶ 727.04[1] at 727-54 to -57 (15th ed. 1987)); *see also In re Brown*, 108 F.3d 1290, 1294 (10th Cir. 1997) (holding that creditor must show that debtor knowingly and fraudulently made an oath that relates to a material fact).

[83]*Keeney v. Smith (In re Keeney),* 227 F.3d 679, 685 (6th Cir. 2000); *In re Brown*, 108 F.3d at 1294.

[84]*In re Serafini*, 938 F.2d 1156 (10th Cir. 1991) (holding proper standard of proof in a § 727(a)(4)(A) proceeding is proof by a preponderance of the evidence rather than by clear and convincing evidence).

[85]6 Collier on Bankruptcy ¶ 727.04[1][c], 727-41 to 727–42 (15th rev. ed. 2001).

[86]*Id*. at ¶ 727.04[1][a], 727-40.

37

mistake or inadvertence.[87]  Honest errors that are corrected will not jeopardize a debtor's discharge.[88]

A false oath is "material," if it bears a relationship to the debtor's business transactions or estate, or concerns the discovery of assets, business dealings, or the existence and disposition of his property.[89]  Although a debtor cannot excise a false oath by making subsequent corrections to his bankruptcy petition, if the estate would have no interest in the property that was omitted, then the omission should not justify a denial of discharge.[90]  However, even assets of little or no value may give rise to a denial of discharge if the omission prevents the trustee or a creditor from fully examining the debtor's pre-bankruptcy financial dealings.[91]

The Trustee demonstrated that Debtor Asif testified, under oath, about the use of the Alliance Petroleum sale proceeds at the § 341 meeting.  He testified approximately $48,000 was used to pay two tobacco and fuel/ grocery vendors.  In later sworn interrogatory answers, in his deposition, and ultimately at trial, however, he changed this testimony.  His latter testimony was that the money was, in fact, used to repay 5 private loans.[92]

There is really no dispute that Asif intentionally made a false statement under oath; the only real issue is if he had an intent to defraud.  Asif contends, however, that his lie was immaterial

---

[87]*In re Butler*, 38 B.R. 884, 889 (Bankr. D. Kan. 1984).

[88]*In re Brown*, 108 F.3d at 1294 (citing *Drewes v. Magnuson (In re Magnuson)*, 113 B.R. 555, 559 (Bankr. D. N.D. 1989) (holding honest error or mere inaccuracy not proper basis for denial of discharge)).

[89]*In re Calder*, 907 F.2d at 955.

[90]*Bensenville Cmty. Ctr. Union v. Bailey* (*In re Bailey*), 147 B.R. 157, 165 (Bankr. N. D. Ill. 1992); 6 Collier on Bankruptcy ¶ 727.04[1][b], 727-40 to 727–41 (15th rev. ed. 2001).

[91]6 Collier on Bankruptcy ¶ 727.04[1][b], 727-40 to 727–41 (15th rev. ed. 2001).

[92]*Compare* Trustee Exhibit 107, pp.21-22 with Trustee Exhibit 110, p. 32, with Tr. p. 629.  Debtor claims his trial testimony was the truth and his § 341 testimony was the lie.  *See* Tr. p. 658.

38

because the money was repaid outside the 90 day preference period, so even had he told the truth initially, the Trustee could still not have pursued recovery for the estate.

The Court finds this information was material and in connection with the case. As noted above, even assets of little or no value may give rise to a denial of discharge if the omission prevents the trustee or a creditor from fully examining the debtor's pre-bankruptcy financial dealings. Asif's decision to lie about these loans caused the Trustee here to go down a rabbit hole, requesting documents, using deposition time, seeking interrogatory answers, and generally trying to find documentation of the $48,000 allegedly paid to pre-petition vendors.

In addition, if Asif would lie about this, the Trustee must surely then inquire what else he was lying about. Perhaps the loans to friends (or to pre-petition vendors) were repaid not after 90 days from the filing of bankruptcy, but instead, within 90 days, such that she could pursue the return of the assets. Or perhaps, like with the $10,900 Lahore transfer that Asif arranged using Hussain's checking account, which seems likely to have been made to insiders, this $48,000 was simply hidden. The Trustee should not have to guess, and this Court doubts the creditors or the Trustee will ever know for sure what Asif did with the sale proceeds. Accordingly, all the elements of the false oath claim are satisfied.

> **4.    The Trustee failed to show that Asif had failed to explain any loss of assets or deficiency of assets to meet his liabilities.**

The Trustee claims that Debtor Asif's discharge should be denied pursuant to § 727(a)(5) because he has failed to explain any loss of assets or deficiency of assets to meet his liabilities. In order to prevail on this claim, the Trustee must make an initial showing of "the disappearance of

substantial assets or of unusual transactions."[93]  Once this initial showing is met, debtors are required

to satisfactorily explain what happened to the assets, since "[t]he debtor is usually in the best position

to reconstruct past dealings and the debtor may not hide behind Rule 4005 to avoid doing so."[94]  As

the Second Circuit Court of Appeals stated in *Federal Provision Co. v. Ershowsky*,[95] "It is [the

debtor] who has caused the loss, who has access to the facts, and who alone knows what the

explanation is; let him make it, let him satisfy the court that it really explains.  Else he will not be

discharged."[96]

The Trustee successfully satisfied her initial burden in this case.  At the end of January 2009,

Debtors sold the property held by Mahaom LLC for $610,000.  Approximately six months later, they

filed for bankruptcy claiming to have only $714.14 in their checking account.  Given this significant

sale of property, the fact that these Debtors owned 100% of that company, and the lack of proceeds

remaining a relatively short time later, it is incumbent on Debtor to explain what happened to all of

those proceeds.

Debtor explained (and adequate documentary evidence corroborated) that from the total sales

price, Alliance assumed a loan in the amount of $218,311.54 and a loan in the amount of

$212,876.69.  After crediting the assumption of these loans against the sales price, the sum of

$170,218.83 remained, and that amount was wired to, and deposited in, a bank account owned by

Mahaom LLC.  Debtors indicated on their Statement of Financial Affairs that with this $170,218.83,

---

[93]6 Collier on Bankruptcy ¶ 727.08 (15th rev. ed. 2001).

[94]*Id.*

[95]94 F.2d 574 (2nd Cir. 1938).

[96]*Id.* at 575.

they used $119,270 to pay a fuel bill owed by Mahaom LLC to Lion Petroleum and $13,000 to pay a fuel bill owed by Maham Inc. to Lion Petroleum. Although the records necessary to substantiate this information were not retained by Debtor, Debtor did finally produce incomplete records. They were so incomplete, however, as to make it impossible for the Trustee to corroborate that these amounts were the correct amount to pay these entities.

There was no evidence to suggest that Debtor had any motivation to overpay these creditors, however. For that reason, it is the remaining $48,000 that is of greater concern to the Court.

Debtor initially testified at a § 341 hearing, under oath, that he used the remaining sum to pay other miscellaneous expenses from winding down the remaining convenience store businesses. As noted, however, Asif later changed that story and claimed he actually used the funds to repay five loans he had received from friends and acquaintances in 2008. Debtor called five witnesses to testify that they had loaned Debtor large sums of cash during 2008. These loans varied between $5,000 and $8,000, with some witnesses testifying they loaned him cash on two separate occasions.

Not a single one of these loans was recorded by any writing, and each witness presented nearly identical testimony that (1) they were friends with Asif, (2) he asked for money to help and they gave it to him—no questions asked, (3) in their culture (all were from Pakistan or neighboring countries), they do not charge interest or make written promises to repay debts, (4) they gave the money to Asif in cash that they had located in their possession (not in the bank such that one could trace the transaction), and (5) Asif repaid them—also in cash, around February or March of 2009, just months before filing this bankruptcy.

The Court found the testimony concerning these loans to be odd. Not only was the testimony by each witnesses almost identical, but some witnesses seemed eager to volunteer testimony, such

41

as the fact that it is not their custom to make written promises to repay debts, before even being asked by Debtors' counsel. In addition, the Court notes that at least one of these witnesses claimed to have only met Asif approximately four times prior to agreeing to loan him thousands of dollars with nothing more than an oral promise that the debt would be repaid. The Court also questioned how one witness, who was a college student working for Asif as a cashier at one of his convenience stores, would have thousands of dollars sitting at home to loan Asif with no questions asked. Again, it seemed odd that someone who needed a job working minimum wage at a convenience store would also have thousands of dollars available to loan to his boss.

That said, the Court notes there was no evidence presented to refute any of the testimony given. Although the evidence was not entirely convincing, it was the only evidence presented, and the Court cannot find that the evidence presented was not truthful when testimony to deny discharge should be viewed in the light most favorable to the Debtor.

In addition, one of the witnesses that testified did state that he would have at least one bank record that would show the withdrawal and deposit of the money he loaned to Asif, and identified the specific identity and location of the bank. The Trustee had the opportunity to subpoena those records, because there was a break in the trial for several weeks after that testimony was received. She either did not obtain the records, or elected not to present the evidence, in an effort to rebut that testimony.

Again, because it is the Trustee's ultimate burden to show that Debtor failed to account for the funds, and it appears the funds were more likely than not spent in the manner Debtor claims, there is no unexplained disappearance or shortage of assets. Accordingly, discharge will not be denied on the § 727(a)(5) claim.

**5.    The Trustee has failed to show that she is entitled to turnover of property pursuant to § 542.**

The Trustee next claims that she is entitled to the turnover of certain estate property pursuant to § 542.  Specifically, the Trustee claims, in the Pretrial Order, that the following documents and/or accountings have not been provided:

> certain documents relating to the Alliance Petroleum and Lion Petroleum transactions; loan documentation relating to two vehicles; loan documentation relating to real and personal property located at 1320 SW 6th Avenue and 2701 SE California; documentation accounting for the $610,000 in gross sale proceeds and the net sum of $170,218.83; documentation regarding the alleged assumption of loans by Alliance Petroleum in the amounts of $218,311.54 and $212,876.69; documentation evidencing a debt obligation and payment of $119,270.00 and $13,984.39 to Lion Petroleum; documentation regarding withdrawals totaling $48,000 plus unknown withdrawals and transfers from Mahaom LLC's checking account number xxxx213 at Community National Bank; and documentation regarding transfers to and withdrawals by Debtor Asif from Hussain's personal checking account at Community National Bank.[97]

The Trustee has the burden of proving what property belongs to the estate, and thus has to be turned over to the estate.[98]

The Court finds that the Trustee did not establish that the itemized information existed, was in Debtor's possession, and had not been turned over.  In fact, much of the information sought formed the basis for the Trustee's successful claim under § 727(a)(3), wherein the Court held that Debtor had failed to keep and preserve business records that would enable the Trustee to fully examine Debtors' financial affairs.  After reviewing the evidence presented at trial, the Court finds that none of the property sought by the Trustee, as outlined above, is in Debtor's possession

---

[97]*See* Adv. No. 10-7007, Pretrial Order, Doc. 44 at p. 9.

[98]*In re Lee*, 415 B.R. 518, 523 (Bankr. D. Kan. 2009) (citing *In re Amdura Corp*, 75 F.3d 1447, 1451 (10th Cir. 1996)).

43

(although it may still be in the possession of third party vendors or others).  Therefore, the Trustee's claim under § 542 is denied.

> **6.      The Trustee has failed to show she is entitled to a judgment in the amount of $48,000.**

The Trustee has requested a judgment in the amount of $48,000 plus all unknown sums transferred and not accounted for by Asif.  The Court has held that Asif finally explained—albeit belatedly and pretty weakly—what he did with the $48,000 remaining from the sale of his businesses.  The only evidence presented at trial was that this money was used to repay personal loans to friends who had lent him money.  The Trustee has not advanced any other basis for a judgment in the amount of $48,000, and has not shown that Asif had this, or any other unreported assets, in his possession on the date of filing.  Therefore, the Court finds there is no basis for awarding the Trustee a monetary judgment in this case.

## III.      CONCLUSION

In his post-trial brief, Asif actually argues that because he is an "honest but unfortunate" Debtor, the Court should deny all claims against him.  This is ironic, because although the vast majority of debtors this Court sees each year are honest but unfortunate, this Debtor does not come close to meeting that description.  Based on the foregoing analysis, the Court finds that the debt owed to the Department of Labor by Defendant, Asif, is a non-dischargeable debt pursuant to § 523(a)(2)(A).

The Court finds that Asif's failure to notify DOL that he no longer had a position for Hussain as a financial manager, which he knew well before the H-1B visa was issued to Hussain, constitutes the kind of actionable false representation or false pretenses contemplated by § 523(a)(2)(A).  But

for that failure to notify the government of the material change in the job that was now available for the H-1B employee, Hussain would not have come to the United States to work for Asif at substandard wages, so the damages are directly caused by that omission.

The Court further finds that Asif made similar omissions when he failed to notify DOL after Hussain's arrival that he was not working as a financial manager, as required by the H-1B program, and he did not pay Hussain the wages required by the H-1B program. Accordingly, the debt that arose as a result of his multiple failures to comply with the H-1B program, is non-dischargeable.

The Court also finds that Debtor Asif should be denied a general discharge pursuant to § 727(a)(3) for failure to keep or preserve proper financial records and pursuant to § 727(a)(4)(A) for knowingly and fraudulently making a false oath or account in connection with his bankruptcy case.

**IT IS, THEREFORE, BY THE COURT ORDERED** that judgment be entered in favor of Hilda L. Solis, Secretary of Labor, on her Complaint objecting to the discharge of the debt owed by Defendant, Mohammad Asif, pursuant to 11 U.S.C. § 523(a)(2)(A).

**IT IS FURTHER ORDERED** that judgment is entered in favor of Darcy Williamson, Trustee, on her Complaint objecting to Mohammad Asif obtaining a discharge pursuant to 11 U.S.C. §§ 727(a)(3) and (4)(A). Judgment is entered in favor of Debtor on the Trustee's Complaint to the extent it sought a denial of discharge pursuant to § 727(a)(4)(D), § 727(a)(5), to the extent it sought turnover pursuant to § 542, and to the extent it sought a money judgment against him.

# # #